# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| United States of America ex rel. | ) | Civil Action No.:_____ |
| Mona Singletary and | ) | |
| Lydia Fulton, and Mona Singletary and | ) | |
| Lydia Fulton as individuals, | ) | |
| | ) | **COMPLAINT** |
| Plaintiffs, | ) | (Under Seal) |
| | ) | |
| vs. | ) | **JURY TRIAL DEMANDED** |
| | ) | **Do Not Put In Press Box** |
| Harmony Care Hospice, Inc., | ) | |
| Beacon Hospice, LLC, | ) | **FALSE CLAIMS ACT** |
| Daniel J. Burton, | ) | Count 1 – § 3729(a)(1)(A) Claim |
| Suzanne Lee, | ) | Count 2 – § 3729(a)(1)(B) Claim |
| Stephanie Owens, | ) | Count 3 – § 3729(a)(1)(G) Claim |
| Stephanie Blanding, | ) | Count 4 – § 3729(a)(1)(C) Claim |
| Christine Fullard, | ) | Count 5 -- § 3730(h) Claim |
| Edward Roberts, and | ) | Count 6 – Wrongful Discharge in |
| Suncrest Residential Care Home, LLC, | ) | Violation of Public Policy |
| | ) | Count 7 – Breach of Contract |
| Defendants. | ) | Count 8 – Outrage |
| | ) | Count 9 – Aiding and Abetting |

**FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

Joseph P. Griffith, Jr., Esquire (Fed.I.D. #2473)
Joe Griffith Law Firm, LLC
Seven State Street
Charleston, South Carolina  29401
(843) 225-5563 (tel)
(843) 722-6254 (fax)
joegriffithjr@hotmail.com
www.joegriffith.com

Attorney for the Plaintiffs/Relators

## INTRODUCTION

1.     Relator Mona Singletary ("Singletary") and Relator Lydia Fulton

("Fulton") (collectively, Singletary and Fulton are sometimes referenced as "Plaintiffs"

and/or "Relators"), bring this action on behalf of the United States of America against the

Defendants for treble damages and civil penalties arising from the Defendants' false statements and false claims to the United States, made to obtain Medicare and Medicaid money payments from the federal government which would not have been paid had the truth of the false statements and false claims been known, in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.* The Relators also bring this action because they have been the subject of retaliation and retaliatory discharges in violation of 31 U.S.C. § 3730(h) as a result of their complaints to the owners and management of Harmony Care Hospice, LLC regarding the company's fraudulent practices, false statements and false claims to the federal government, as set forth in detail below, in violation of Medicare and Medicaid laws, regulations and rules. Plaintiffs also bring their state common law claims in their individual capacities.

2.     As required by the False Claims Act, 31 U.S.C. § 3730(b)(2), the Relators have voluntarily provided to the Attorney General of the United States and to the United States Attorney for the District of South Carolina, prior to filing this Complaint, a written disclosure statement of all material evidence and information in the Relators' possession related to the allegations in the Complaint ("Disclosure Statement"). The Disclosure Statement is supported by first-hand, direct, independent personal knowledge of Relators and material evidence at the time of filing establishing the existence of the Defendants' false and fraudulent claims and conspiracy with respect thereto.

## JURISDICTION AND VENUE

3.     The Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. §§ 3730(b) and 3732(a), and 28 U.S.C. §§ 1331, 1345, and 1355, and

supplemental jurisdiction under 28 U.S.C. § 1367(a).  The Court may exercise personal

jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a).

4.    Venue is proper in the District of South Carolina pursuant to 28 U.S.C. §

1391(b) and 31 U.S.C. § 3732(a).

## PARTIES - RELATORS

5.    Relator Singletary is a United States citizen and a resident of South

Carolina.  From approximately September 15, 2008 until approximately January 13,

2010, Singletary was employed by Harmony Care Hospice's Lake City, South Carolina

office as a full-time salaried Licensed Master Social Worker (LMSW).  For most of her

employment, her supervisor was Lake City Harmony Care Hospice Clinical Director,

Christine Fullard.  Relator Singletary was fired from her job at Harmony Care Hospice

due to her complaints to the company's owners and management about its fraudulent

practices, as set forth in detail below, in violation of Medicare and Medicaid laws,

regulations and rules.  As a result of her former employment with the Defendant

Harmony Care Hospice, Relator Singletary has direct, first-hand, independent personal

knowledge of the Defendants' fraudulent conduct set forth in this Complaint, and is an

"original source" as defined by 31 U.S.C. § 3730(e)(4)(B).

6.    Relator Fulton is a United States citizen and a resident of South Carolina.

From approximately October, 2008 until approximately January 13, 2010, Fulton was

employed by Harmony Care Hospice's Lake City, South Carolina office as the

administrative assistant to the Lake City Harmony Care Hospice Clinical Director,

Christine Fullard.  Relator Fulton was fired from her job at Harmony Care Hospice due to

her complaints to the company's owners and management about its fraudulent practices,

as set forth in detail below, in violation of Medicare and Medicaid laws, regulations and rules. As a result of her former employment with the Defendant Harmony Care Hospice, Relator Fulton has direct, first-hand, independent personal knowledge of the Defendants' fraudulent conduct set forth in this Complaint, and is an "original source" as defined by 31 U.S.C. § 3730(e)(4)(B).

## PARTIES - DEFENDANTS

7.     Defendant Harmony Care Hospice, Inc. ("HCH") is a corporation registered and domiciled in the State of South Carolina which transacts business in the State of South Carolina by and through its owners, officers, employees, agents and representatives. Upon information and belief, its sole owner and Registered Agent for South Carolina is Daniel J. Burton.   HCH is a hospice care company with locations in Lake City, Hartsville, Clinton and Columbia. HCH is a hospice licensed by the South Carolina Department of Health and Environmental Control ("DHEC"), License # HPC-0113, and is licensed to serve all forty-six South Carolina Counties. Its website is www.harmonycarehospice.com. HCH was and is a knowing and active participant in the fraudulent conduct described in this complaint, including the submission of false and fraudulent claims and false and fraudulent statements to Medicare and Medicaid as well as the creation of false and fraudulent records and documents related to the said claims.

8.     Defendant Beacon Hospice, LLC ("Beacon") is a limited liability company registered and domiciled in the State of South Carolina which transacts business in the State of South Carolina by and through its owners, officers, employees, agents and representatives. Upon information and belief, its sole owner and Registered Agent for South Carolina is Daniel J. Burton. Beacon is a hospice care company located in the

Town of Mt. Pleasant, Charleston County, South Carolina.  Beacon is a hospice licensed

by the South Carolina DHEC, License # HPC-0113, and is licensed to serve the following

South Carolina Counties:  Allendale, Bamberg, Barnwell, Beaufort, Berkeley,

Charleston, Clarendon, Colleton, Dillon, Dorchester, Florence, Georgetown, Hampton,

Horry, Jasper, Marion, Williamsburg and Orangeburg.  Upon information and belief,

Beacon is an affiliate of, and/or affiliated with, HCH.  Beacon's website is

www.beaconhospice.org.   Beacon was and is a knowing and active participant in the

fraudulent conduct described in this complaint, including the submission of false and

fraudulent claims and false and fraudulent statements to Medicare and Medicaid as well

as the creation of false and fraudulent records and documents related to the said claims.

9.      Defendant Daniel J. Burton ("Burton") is and was, upon information and

belief, at all times material to the allegations in this Complaint, the Chief Executive

Officer ("CEO") and the sole shareholder of HCH, and the CEO and the sole member of

Beacon.  Upon information and belief, Burton is a citizen of the United States and a

resident of the State of South Carolina.  Burton was and is a knowing and active

participant in the fraudulent conduct described in this complaint, including the

submission of false and fraudulent claims and false and fraudulent statements to

Medicare and Medicaid as well as the creation of false and fraudulent records and

documents related to the said claims.

10.     Defendant Suzanne Lee ("Lee"), a registered nurse, is and was, upon

information and belief, at all times material to the allegations in this Complaint, the

clinical director of HCH and Beacon.  Upon information and belief, Lee is a citizen of the

United States and a resident of the State of South Carolina.  Lee was and is a knowing

and active participant in the fraudulent conduct described in this complaint, including the submission of false and fraudulent claims and false and fraudulent statements to Medicare and Medicaid as well as the creation of false and fraudulent records and documents related to the said claims.

11.    Defendant Stephanie Owens ("Owens"), a registered nurse, is and was, upon information and belief, at all times material to the allegations in this Complaint, the clinical director of HCH and Beacon.  Upon information and belief, Owens is a citizen of the United States and a resident of the State of South Carolina. Owens was and is a knowing and active participant in the fraudulent conduct described in this complaint, including the submission of false and fraudulent claims and false and fraudulent statements to Medicare and Medicaid as well as the creation of false and fraudulent records and documents related to the said claims.

12.    Defendant Stephanie Blanding ("Blanding") is and was, upon information and belief, at all times material to the allegations in this Complaint, the director of human resources for HCH and Beacon.  Upon information and belief, Blanding is a citizen of the United States and a resident of the State of South Carolina.  Blanding was and is a knowing and active participant in the fraudulent conduct described in this complaint, including the submission of false and fraudulent claims and false and fraudulent statements to Medicare and Medicaid as well as the creation of false and fraudulent records and documents related to the said claims.

13.    Defendant Christine Fullard ("Fullard") was, until she left the employment of HCH in or about October, 2009, the HCH Lake City Clinical Director at all times material to the allegations in this Complaint. Upon information and belief, Fullard is a

citizen of the United States and a resident of the State of South Carolina.  Fullard was a knowing and active participant in the fraudulent conduct described in this complaint, including the submission of false and fraudulent claims and false and fraudulent statements to Medicare and Medicaid as well as the creation of false and fraudulent records and documents related to the said claims.

14.    Defendants HCH, Beacon, Burton, Lee, Owens, Blanding and Fullard are sometimes hereinafter collectively referenced as the "HCH Defendants."

15.    Defendant Edward Roberts ("Roberts") is and was, upon information and belief, at all times material to the allegations in this Complaint, the operations manager and the sole member of Suncrest Residential Care Home, LLC.  Upon information and belief, Roberts is a citizen of the United States and a resident of the State of South Carolina.  Roberts was and is a knowing and active participant in the fraudulent conduct described in this complaint, including the submission of false and fraudulent claims and false and fraudulent statements to Medicare and Medicaid as well as the creation of false and fraudulent records and documents related to the said claims.

16.    Defendant Suncrest Residential Care Home, LLC ("Suncrest") is a limited liability company registered and domiciled in the State of South Carolina which transacts business in the State of South Carolina by and through its owners, officers, employees, agents and representatives.  Upon information and belief, Roberts is its sole owner/member and South Carolina Registered Agent.  Upon information and belief, Suncrest operates a 47-bed residential/assisted living home facility located in the Florence, South Carolina.  Upon information and belief, Suncrest is licensed as a residential/assisted living home facility by the South Carolina DHEC, License No. CRC-

1479.  Suncrest was and is a knowing and active participant in the fraudulent conduct described in this complaint, including the submission of false and fraudulent claims and false and fraudulent statements to Medicare and Medicaid as well as the creation of false and fraudulent records and documents related to the said claims.

17.    Defendants Suncrest and Roberts are sometimes hereinafter collectively referenced as the "Suncrest Defendants."

## THE FALSE CLAIMS ACT LAW

18.    The False Claims Act ("FCA"), at 31 U.S.C § 3729, provides, in pertinent part, as follows:

 (a) Liability for certain acts.

(1) In general. Subject to paragraph (2), any person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);…
(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $ 5,500 and not more than $ 11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(b) Definitions. For purposes of this section--
(1) the terms "knowing" and "knowingly"--
(A) mean that a person, with respect to information--
(i) has actual knowledge of the information;
(ii) acts in deliberate ignorance of the truth or falsity of the information; or
(iii) acts in reckless disregard of the truth or falsity of the information; and
(B) require no proof of specific intent to defraud;
(2) the term "claim"--

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

19.    The False Claims Act ("FCA"), at 31 U.S.C § 3730, provides, in pertinent part, as follows:

(h) Relief from retaliatory actions.

(1) In general. Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, or agent or associated others in furtherance of other efforts to stop 1 or more violations of this subchapter.

(2) Relief. Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An action under this subsection may be brought in the appropriate district court of the United States for the relief provided in this subsection.

20.    The Anti-Kickback Statute ("AKS"), at 42 U.S.C. § 1320a-7b, provides, in pertinent part, as follows:

(a) Making or causing to be made false statements or representations Whoever—

(1) knowingly and willfully makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under a Federal health care program (as defined in subsection (f) of this section),

(2) at any time knowingly and willfully makes or causes to be made any false statement or representation of a material fact for use in determining rights to such benefit or payment,

(3) having knowledge of the occurrence of any event affecting

(A) his initial or continued right to any such benefit or payment, or

(B) the initial or continued right to any such benefit or payment of any other individual in whose behalf he has applied for or is receiving such benefit or payment, conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized,

(4) having made application to receive any such benefit or payment for the use and benefit of another and having received it, knowingly and willfully converts such benefit or payment or any part thereof to a use other than for the use and benefit of such other person,

(5) presents or causes to be presented a claim for a physician's service for which payment may be made under a Federal health care program and knows that the individual who furnished the service was not licensed as a physician, or

(6) for a fee knowingly and willfully counsels or assists an individual to dispose of assets (including by any transfer in trust) in order for the individual to become eligible for medical assistance under a State plan under subchapter XIX of this chapter, if disposing of the assets results in the imposition of a period of ineligibility for such assistance under section 1396p (c) of this title, shall

(i) in the case of such a statement, representation, concealment, failure, or conversion by any person in connection with the furnishing (by that person) of items or services for which payment is or may be made under the program, be guilty of a felony and upon conviction thereof fined not more than $25,000 or imprisoned for not more than five years or both, or

(ii) in the case of such a statement, representation, concealment, failure, conversion, or provision of counsel or assistance by any other person, be guilty of a misdemeanor and upon conviction thereof fined not more than $10,000 or imprisoned for not more than one year, or both. In addition, in any case where an individual who is otherwise eligible for assistance

under a Federal health care program is convicted of an offense under the preceding provisions of this subsection, the administrator of such program may at its option (notwithstanding any other provision of such program) limit, restrict, or suspend the eligibility of that individual for such period (not exceeding one year) as it deems appropriate; but the imposition of a limitation, restriction, or suspension with respect to the eligibility of any individual under this sentence shall not affect the eligibility of any other person for assistance under the plan, regardless of the relationship between that individual and such other person.

(b) Illegal remunerations

(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both…

(c) Whoever knowingly and willfully makes or causes to be made, or induces or seeks to induce the making of, any false statement or representation of a material fact with respect to the conditions or operation of any institution, facility, or entity in order that such institution, facility, or entity may qualify (either upon initial certification or upon recertification) as a hospital, critical access hospital, skilled nursing facility, nursing facility, intermediate care facility for the mentally retarded, or other entity (including an eligible organization under section 1876(b)) for which certification is required under title XVIII or a State

health care program (as defined in section 1128(h)), or with respect to information required to be provided under section 1124A, shall be guilty of a felony and upon conviction thereof shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

21.    The Stark statute ("Stark"), at 42 U.S.C. § 1395nn provides, in pertinent part, as follows:

(a) Prohibition of certain referrals

(1) In general

Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then--
(A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and
(B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

(2) Financial relationship specified

For purposes of this section, a financial relationship of a physician (or an immediate family member of such physician) with an entity specified in this paragraph is--
(A) except as provided in subsections (c) and (d) of this section, an ownership or investment interest in the entity, or
(B) except as provided in subsection (e) of this section, a compensation arrangement (as defined in subsection (h)(1) of this section) between the physician (or an immediate family member of such physician) and the entity.

22.    The Health Care Fraud statute, at 18 U.S.C. § 1347, provides, in pertinent part, as follows:

 Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—
(1) to defraud any health care benefit program; or
(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. If the violation results in serious bodily injury (as defined in section 1365 of this title), such person shall be fined under this title or imprisoned not more than 20 years, or both; and if the violation results in death, such person shall be fined under this title, or imprisoned for any term of years or for life, or both.

23.    The Social Security Act, at 42 U.S.C. § 1395x(d)(d)(1), provides in pertinent part as follows:  "The term **'hospice care' means** the following items and **services** provided **to a terminally ill individual** by, or by others under arrangements made by, **a hospice program** under a **written plan** (for providing such care to such individual) established and periodically reviewed by the individual's attending physician and by the medical director (and by the interdisciplinary group described in paragraph (2)(B)) of the program…."  (emphasis added)

24.    The Social Security Act, at 42 U.S.C. § 1395x(d)(d)(3), provides in pertinent part as follows:

(A) An individual is considered to be **"terminally ill" if** the individual has a **medical prognosis** that the **individual's life expectancy is 6 months or less**.

(B) The term "attending physician" means, with respect to an individual, the physician (as defined in subsection (r)(1) of this section) or nurse practitioner (as defined in subsection (aa)(5) of this section), who may be employed by a hospice program, whom the individual identifies as having the most significant role in the determination and delivery of medical care to the individual at the time the individual makes an election to receive hospice care.

(emphasis added)

25.    The Social Security Act, at 42 U.S.C. § 1395x(d)(d)(4), provides in pertinent part as follows:

(A) An entity which is certified as a provider of services other than a hospice program shall be considered, for purposes of certification as a hospice program, to have met any requirements under paragraph (2) which are also the same requirements for certification as such other type of provider. The Secretary shall coordinate surveys for determining certification under this subchapter so as to

provide, to the extent feasible, for simultaneous surveys of an entity which seeks to be certified as a hospice program and as a provider of services of another type.

(B) Any entity which is certified as a hospice program and as a provider of another type shall have separate provider agreements under section 1395cc of this title and shall file separate cost reports with respect to costs incurred in providing hospice care and in providing other services and items under this subchapter.

26.     The Social Security Act, at 42 U.S.C. § 1395f, entitled "Conditions of and limitations on payment for services," provides in pertinent part as follows:

(a) Requirement of requests and certifications

Except as provided in subsections (d) and (g) of this section and in section 1395mm of this title, payment for services furnished an individual may be made only to providers of services which are eligible therefor under section 1395cc of this title and only if— …

(7)  in the case of hospice care provided an individual—

        (A)(i) in **the first 90-day period** — (I) **the individual's attending physician** (as defined in section 1861(dd)(3)(B)) (which for purposes of this subparagraph does not include a nurse practitioner), **and** (II) **the medical director** (or physician member of the interdisciplinary group described in section 1861(dd)(2)(B)) of the hospice program providing (or arranging for) the care, **each certify in writing**, at the beginning of the period, **that the individual is terminally ill** (as defined in section 1861(dd)(3)(A)), and based on the physician's or medical director's clinical judgment regarding the normal course of the individual's illness, (ii) **in a subsequent 90 or 60-day period**, the medical director or physician described in clause (i)(II) **recertifies** at the beginning of the period that the **individual is terminally ill** based on such clinical judgment;

        (B) a written plan for providing hospice care with respect to such individual has been established (before such care is provided by, or under arrangements made by, that hospice program) and is periodically reviewed by the individual's attending physician and by the medical director (and the interdisciplinary group described in section 1861(dd)(2)(B)) of the hospice program; and

        (C) such **care is being or was provided** **pursuant to** **such plan of care**….

(i) Payment for hospice care

(1)

(A) Subject to the limitation under paragraph (2) and the provisions of section 1395e (a)(4) of this title and except as otherwise provided in this paragraph, the amount paid to a hospice program with respect to hospice care for which payment may be made under this part shall be an amount equal to the costs which are reasonable and related to the cost of providing hospice care or which are based on such other tests of reasonableness as the Secretary may prescribe in regulations (including those authorized under section 1395x (v)(1)(A) of this title), except that no payment may be made for be-reavement counseling and no reimbursement may be made for other counseling services (including nutritional and dietary counseling) as separate services.

(B) Notwithstanding subparagraph (A), for hospice care furnished on or after April 1, 1986, the daily rate of payment per day for routine home care shall be $63.17 and the daily rate of payment for other services included in hospice care shall be the daily rate of payment recognized under subparagraph (A) as of July 1, 1985, increased by $10.

(C)

(i) With respect to routine home care and other services included in hospice care furnished on or after January 1, 1990, and on or before September 30, 1990, the payment rates for such care and services shall be 120 percent of such rates in effect as of September 30, 1989.

(ii) With respect to routine home care and other services included in hospice care furnished during a subsequent fiscal year, the payment rates for such care and services shall be the payment rates in effect under this subparagraph during the previous fiscal year increased by—

(I) for a fiscal year ending on or before September 30, 1993, the market basket percentage increase (as defined in section 1395ww (b)(3)(B)(iii) of this title) for the fiscal year;

(II) for fiscal year 1994, the market basket percentage increase for the fiscal year minus 2.0 percentage points;

(III) for fiscal year 1995, the market basket percentage increase for the fiscal year minus 1.5 percentage points;

(IV) for fiscal year 1996, the market basket percentage increase for the fiscal year minus 1.5 percentage points;

(V) for fiscal year 1997, the market basket percentage increase for the fiscal year minus 0.5 percentage point;

(VI) for each of fiscal years 1998 through 2002, the market basket percentage increase for the fiscal year involved minus 1.0 percentage points, plus, in the case of fiscal year 2001, 5.0 percentage points; and

(VII) for a subsequent fiscal year, the market basket percentage increase for the fiscal year.

(2)

(A) The amount of payment made under this part for hospice care provided by (or under arrangements made by) a hospice program for an accounting year may not exceed the "cap amount" for the year (computed under subparagraph (B)) multiplied by the number of medicare beneficiaries in the hospice program in that year (determined under subparagraph (C)).

(B) For purposes of subparagraph (A), **the "cap amount" for a year is $6,500**, increased or decreased, for accounting years that end after October 1, 1984, by the same percentage as the percentage increase or decrease, respectively, in the medical care expenditure category of the Consumer Price Index for All Urban Consumers (United States city average), published by the Bureau of Labor Statistics, from March 1984 to the fifth month of the accounting year.

(C) For purposes of subparagraph (A), the "number of medicare beneficiaries" in a hospice program in an accounting year is equal to the number of individuals who have made an election under subsection (d) of this section with respect to the hospice program and have been provided hospice care by (or under arrangements made by) the hospice program under this part in the accounting year, such number reduced to reflect the proportion of hospice care that each such individual was provided in a previous or subsequent accounting year or under a plan of care established by another hospice program.

(D) A hospice program shall submit claims for payment for hospice care furnished in an individual's home under this subchapter only on the basis of the geographic location at which the service is furnished, as determined by the Secretary.

(3) **Hospice programs providing hospice care for which payment is made** under this subsection **shall submit to the Secretary such data** with respect to **the costs for providing such care** for each fiscal year, beginning with fiscal year 1999, as the Secretary determines necessary.

(emphasis added)

27.    The Medicare Claims Processing Manual, at Chapter 11 – Processing

Hospice Claims, in Section 80.2, entitled "Cap on Overall Hospice Reimbursement,"

provides in pertinent part as follows:

Overall aggregate payments made to a hospice are subject to a **"**cap amount,**"** calculated by the FI at the end of the hospice cap period. The cap period runs from November 1st of each year through October 31 of the next year. The total payment made for services furnished to Medicare beneficiaries during this period

are compared to the "cap amount" for this period. **Any payments in excess of the cap must be refunded by the hospice**.

(emphasis added)

28.     Hospices are required to bill Medicare on a monthly basis.  See the Medicare Claims Processing Manual, at Chapter 11 – Processing Hospice Claims, in Section 90 – Frequency of Billing.

29.     The Social Security Act, at 42 U.S.C. § 1395y(a), provides in pertinent part as follows:  Notwithstanding any other provision of this title, **no payment** may be made under part A or part B for any expenses incurred **for items or services**— … (C) **in the case of hospice care**, **which are not reasonable and necessary** for the **palliation or management of terminal illness**….  (emphasis added)

30.     The Medicare hospice regulations, at 42 C.F.R. § 418.200, provides in pertinent part as follows:

Requirements for coverage.

To be covered, hospice services must meet the following requirements. They must be reasonable and necessary for the palliation and management of the terminal illness as well as related conditions. The individual must elect hospice care in accordance with §418.24. A plan of care must be established and periodically reviewed by the attending physician, the medical director, and the interdisciplinary group of the hospice program as set forth in §418.56. That plan of care must be established before hospice care is provided. The services provided must be consistent with the plan of care. A certification that the individual is terminally ill must be completed as set forth in section §418.22.

## FACTUAL BACKGROUND

**Federally Funded Health Insurance Programs**

31.     In 1965, Congress established the Medicare Program to provide health insurance for the elderly and disabled.  Payments from the Medicare Program arise from

the Medicare Trust fund, which is funded by working Americans through payroll deductions taken from the work force, in addition to government contributions.

32.    Much of the daily administration and operation of the Medicare Program is managed through private insurance companies that contract with the Government. These private insurance companies, sometimes called "Medicare Carriers" or "Fiscal Intermediaries," are charged with and responsible for accepting Medicare claims, determining coverage, and making payments from the Medicare Trust Fund.  These carriers, including Palmetto Government Benefits Administrators (hereinafter "PGBA"), a division of Blue Cross and Blue Shield of South Carolina, operate pursuant to 42 U.S.C. §§ 1395h and 1395u and rely on the good faith and truthful representations of health care providers when processing claims.

33.    Over the past forty years, the Medicare Program has enabled the elderly and disabled to obtain necessary medical services from medical providers throughout the United States.

34.    Critical to the success of the Medicare Program is the fundamental concept that medical providers accurately and honestly submit claims and bills to the Medicare Trust Fund only for those medical treatments or services that are legitimate and medically necessary, in full compliance with all laws, regulations, rules, and conditions of participation, and, further, that medical providers not take advantage of their elderly and disabled patients.

35.    The Medicaid Program provides care for indigent people.  Although administered by individual states, the Medicaid Program is funded primarily by the federal government.

36.    The Medicare and Medicaid programs require institutional health care providers, including hospices such as HCH and Beacon, and assisted living homes such as Suncrest, to file an enrollment application in order to qualify to receive the programs' benefits.  Upon information and belief, HCH, Beacon and Suncrest submitted enrollment applications to these federal program providers and certified that they would comply with Medicare and Medicaid laws, regulations, and program instructions, and further certified that they understood that payment of a claim by Medicare and Medicaid was conditioned upon the claim and underlying transaction complying with such laws, regulations, and program instructions, including the Federal AKS and Stark statutes.

37.    Upon information and belief, HCH, Beacon and Suncrest each had an authorized representative sign a Medicare Enrollment Application, Form CMS-855A, which stated as follows:   "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal AKS and Stark laws), and on the provider's compliance with all applicable conditions of participation in Medicare."

38.    With the aid, knowledge and complicity of their respective employees, owners, agents and servants, Defendants HCH, Beacon and Suncrest each fraudulently and falsely materially misrepresented their intent to abide by the Medicare laws, regulations and program instructions when they signed the said Medicare Enrollment Applications, because they knew that they did not intend to so abide by the Medicare

laws, regulations and program instructions.  Defendants HCH, Beacon and Suncrest each

fraudulently and falsely failed and omitted to disclose material information to Medicare

and Medicaid, to wit, that they were intentionally and fraudulently not abiding by, and,

upon information and belief, continue to not abide by, the said Medicare laws, regulations

and program instructions by committing the frauds and false statements set forth in this

complaint.

      39.    Upon information and belief, HCH and Beacon each had an authorized

representative sign annual hospice cost and data reports, Form CMS 1984-99, which

stated in part as follows:

> MISREPRESENTATION OR FALSIFICATION OF ANY
> INFORMATION CONTAINED IN THIS COST REPORT MAY BE
> PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE
> ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW.
> FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT
> WERE PROVIDED OR PRODUCED THROUGH THE PAYMENT
> DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE
> OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND
> ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT
> MAY RESULT.

> CERTIFICATION BY OFFICER OR ADMINISTRATOR OF
> PROVIDER(S)

> I HEREBY CERTIFY that I have read the above statement and that I have
> examined the accompanying electronically filed or manually submitted
> cost report and the Balance Sheet and Statement of Revenue and Expenses
> prepared by_____(Provider Names(s) and Number(s)) for the cost reporting
> period beginning _____ and ending _____ and that to the best of my
> knowledge and belief, it is a true, correct and complete statement prepared
> from the books and records of the provider in accordance with applicable
> instructions, except as noted.  I further certify that I am familiar with the
> laws and regulations regarding the provision of health care services and
> that the services identified in this cost report were provided in compliance
> with such laws and regulations.

40.    With the aid, complicity and knowledge of Defendants Burton, Lee, Owens, Blanding, and/or Fullard, Defendants HCH and Beacon each fraudulently and falsely materially misrepresented in the said annual hospice cost and data reports for at least the years 2007, 2008, and 2009 that the information therein was true, correct and complete, and that the services identified in the said reports were in compliance with the applicable government health care program instructions, laws and regulations, when, as set forth in this complaint, said certifications and statements were materially false, fraudulent, untrue, incomplete, incorrect, and misleading.

41.    With the aid, complicity and knowledge of Defendant Roberts, Defendant Suncrest fraudulently and falsely materially misrepresented in its annual cost and data reports to Medicare/Medicaid for at least the years 2007, 2008, and 2009 that the information therein was true, correct and complete, and that the services identified in the said reports were in compliance with the applicable government health care program instructions, laws and regulations, when, as set forth in this complaint, said certifications and statements were materially false, fraudulent, untrue, incomplete, incorrect, and misleading.

42.    Upon information and belief, HCH and Beacon each had an authorized representative sign claim forms for payment, filed with their Fiscal Intermediary or Medicare Carrier pursuant to the CMS Claims Manual, Form CMS 1450 (also known as a Form UB-04 or Form UB-92), either in paper or electronic form, which stated in pertinent part as follows:

UB-04 NOTICE: THE **SUBMITTER** OF THIS FORM **UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS**

**AND MAY UPON CONVICTION INCLUDE FINES AND/OR
IMPRISONMENT** UNDER FEDERAL AND/OR STATE LAW(S).

**Submission of this claim constitutes certification that the billing
information as shown on the face hereof is true, accurate and
complete. That the submitter did not knowingly or recklessly
disregard or misrepresent or conceal material facts**. The following
certifications or verifications apply where pertinent to this Bill:

1. If third party benefits are indicated, the appropriate
assignments by the insured/beneficiary and signature of
the patient or parent or a legal guardian covering
authorization to release information are on file.
Determinations as to the release of medical and financial
information should be guided by the patient or the
patient's legal representative.

2. If patient occupied a private room or required private
nursing for medical necessity, any required certifications
are on file.

3. Physician's certifications and re-certifications, if required
by contract or Federal regulations, are on file.

4. For Religious Non-Medical facilities, verifications and if
necessary re-certifications of the patient's need for
services are on file.

5. Signature of patient or his representative on certifications,
authorization to release information, and payment
request, as required by Federal Law and Regulations (42
USC 1935f, 42 CFR 424.36, 10 USC 1071 through 1086, 32
CFR 199) and any other applicable contract regulations, is
on file.

6. The provider of care submitter acknowledges that the bill
is in conformance with the Civil Rights Act of 1964 as
amended. Records adequately describing services will be
maintained and necessary information will be furnished to
such governmental agencies as required by applicable
law.

7. For Medicare Purposes: If the patient has indicated that
other health insurance or a state medical assistance
agency will pay part of his/her medical expenses and
he/she wants information about his/her claim released to

them upon request, necessary authorization is on file.
The patient's signature on the provider's request to bill
Medicare medical and non-medical information, including
employment status, and whether the person has employer
group health insurance which is responsible to pay for the
services for which this Medicare claim is made.

8. For Medicaid purposes: The submitter understands that
because payment and satisfaction of this claim will be
from Federal and State funds, any false statements,
documents, or concealment of a material fact are subject
to prosecution under applicable Federal or State Laws.

(emphasis added)

43.    With the aid, complicity and knowledge of Defendants Burton, Lee,

Owens, Blanding and/or Fullard, Defendants HCH and Beacon each fraudulently and

falsely materially misrepresented in the said Medicare and Medicaid claim forms for

payment during at least the years 2007, 2008, and 2009, and, upon information and

belief, continues to do so on an ongoing basis, that the information therein was and is

true, correct and complete, and that the services identified in the said claims were in

compliance with the applicable government health care program instructions, laws and

regulations, when, as set forth in this complaint, these Defendants' fraudulent conduct

made said certifications, statements and information materially false, fraudulent, untrue,

incomplete, incorrect, and misleading.

44.    With the aid, complicity and knowledge of Defendant Roberts, Defendant

Suncrest fraudulently and falsely materially misrepresented in the said Medicare and

Medicaid claim forms for payment during at least the years 2007, 2008, and 2009, and,

upon information and belief, continues to do so on an ongoing basis, that the information

therein was and is true, correct and complete, and that the services identified in the said

claims were in compliance with the applicable government health care program

instructions, laws and regulations, when, as set forth in this complaint, these Defendants' fraudulent conduct made said certifications, statements and information materially false, fraudulent, untrue, incomplete, incorrect, and misleading.

**Defendants' Schemes and Artifices to Defraud –**

**Admitting Hospice Patients Who Were Not Terminally Ill**

45.    Relator Singletary was an employee of HCH from approximately September 2008 until she was unlawfully fired on or about January 13, 2010 for complaining about and reporting the Defendants' false and fraudulent activities.  Relator Fulton was an employee of HCH from approximately October 2008 until she was unlawfully fired on or about January 13, 2010 for complaining about and reporting the Defendants' false and fraudulent activities.

46.    During Relators' employment with Defendant HCH, they repeatedly complained and raised questions to their employer about the HCH Defendants' billing and healthcare practices and procedures, including false and fraudulent billings to federally funded health care insurance programs Medicare and Medicaid.  The Relators repeatedly expressed their concerns to their employer of illegal practices by the Defendants, but these express notifications and warnings of Medicare and Medicaid fraud were ignored and the frauds were permitted to continue upon the federal government.

47.    The federally funded health insurance programs pay based on a criteria being met by each patient's diagnosis and eligibility.  It is a requirement that both the medical records and claims for payment accurately reflect the diagnosis and eligibility of any patient for continued hospice care.

48.    In order for a hospice to qualify to receive payments for hospice services under Medicare and Medicaid, hospice patient beneficiaries must be certified by a physician as being terminally ill and with a life expectancy of six months or less should a disease run its natural course.

49.    Defendants HCH and Beacon were falsely and fraudulently billing Medicare and Medicaid for hospice services by repeatedly falsely and fraudulently misrepresenting that all of their patients' diagnoses met the eligibility criteria for hospice care in order to continue billing the federally funded health care programs.  Defendants HCH and Beacon routinely billed for "hospice care" even though the terminally ill requirements were not met.

50.    Relators became aware that Defendants HCH and Beacon engaged in a practice and pattern of falsely stating that their patients met the terminally ill eligibility requirement of Medicare and Medicaid and submitting false claims to the federal government.  Relators estimate that nearly 80% of the patients of Defendants HCH and Beacon did not meet Medicare and Medicaid's eligibility requirement of being terminally ill.  Rather, these patients had chronic illnesses and were not expected to die within 6 months of their initial 90-day admission or at subsequent 90-day and 60-day re-certifications.

51.    Defendants HCH and Beacon benefited from these fraudulent billings since they received payments from Medicare and Medicaid for the claims that were falsely submitted, and the federal government would not have paid for these claims had it known of the truth and veracity of the then-existing facts.

complaint.5-28-2010.jg final

52.    By failing to present and submit accurate, true, correct and eligible claims, by omitting key information from medical records and charts, and by misrepresenting the diagnosis of the patients, Defendants submitted false and fraudulent claims for payment to the federally funded health insurance programs.

53.    By way of specific example, the table below sets forth a sample of HCH Defendants' hospice patients who, as of January, 2010, were not terminally ill as required under the federal hospice Medicare and Medicaid laws.[1]  The diagnoses of these patients included General Debility, Failure to Thrive, Coronary Artery Disease ("CAD"), Dementia, Alzheimer's, Chronic Obstructive Pulmonary Disease ("COPD"), and Congestive Heart Failure ("CHF").  As of January, 2010, these patients had been in hospice care for time periods ranging from 14 months to 38 months, and were clearly not terminally ill.  Each 90-day certification and re-certification in these patients' medical charts and related monthly claims for payment submitted to the federal government, and each 60-day re-certification in these patients' medical charts and related monthly claims for payment submitted to the federal government, were false and fraudulent in that these patients were not terminally ill and not expected to die within 6 months.

| Patient MR# | # 90-day Certs | # 60-day Re-Certs | Total # of days (Last known) | Diagnosis |
|---|---|---|---|---|
| 3008064 | 2 | 6 | 540 days (18 months) | General Debility |
| 3008056 | 2 | 7 | 600 days (20 months) | CAD |
| 3008055 | 2 | 7 | 600 days (20 months) | General Debility |
| 3008094 | 2 | 5 | 480 days (16 months) | General Debility |
| 3009003 | 2 | 4 | 420 days (14 months) | Dementia |

[1] In order to protect the patients' privacy, their individual names are not referenced.  The MR# is the internal account number assigned to an individual patient by the HCH Defendants.

| 3009052 | 2 | 10 | 780 days (26 months) | General Debility |
|---|---|---|---|---|
| 3009044 | 2 | 16 | 1,140 days (38 months) | Dementia |
| 3009038 | 2 | 4 | 420 days (14 months) | General Debility |
| 3008088 | 2 | 4 | 420 days (14 months) | COPD |
| 3009032 | 2 | 10 | 780 days (26 months) | Alzheimer's |
| 3009010 | 2 | 5 | 480 days (16 months) | General Debility |
| 3008083 | 2 | 5 | 480 days (16 months) | Failure to Thrive |
| 3008093 | 2 | 5 | 480 days (16 months) | General Debility |
| 3009018 | 2 | 6 | 540 days (18 months) | CHF |
| 3009023 | 2 | 6 | 540 days (18 months) | General Debility |
| 3009028 | 2 | 5 | 480 days (16 months) | CHF |
| 3009025 | 2 | 7 | 600 days (20 months) | General Debility |

54.     As another example of a patient who was not terminally ill, Patient MR# 3008063, upon information and belief, while an HCH hospice patient, went to a hospital and received a surgically implanted heart pacemaker to regulate his heart condition. This patient was not suffering from a terminal illness, and was seeking aggressive treatment to extend his life, yet HCH was falsely and fraudulently billing Medicare for the patient's hospice treatment.

55.     Patient MR# 3009014 and Patient MR# 3009015 were two sisters who lived together. Upon information and belief, they were discharged from Winyah Hospice for not being eligible for hospice services. Yet, Defendant HCH enrolled them as hospice patients even though they did not qualify for hospice care and were not terminally ill.

56.    Patient MR# 3008080 was admitted to HCH for hospice care with a diagnosis of general debility.  This patient was not terminally ill and the only reason this patient was admitted was because his great niece was a home health aide at HCH.

57.    Patient MR# 3008065 was admitted to HCH for hospice care with a diagnosis of general debility.  This patient was not terminally ill and the only reason this patient was admitted was because her grand-daughter worked at HCH.

58.    In the fall of 2009, after Fullard was terminated as an HCH employee, Defendant nurse Owens visited the HCH Lake City facility to audit the patients' chart and she met with the following RNCMs: Margaret Jones, Kimberly Parker, Kelli McKenzie and Cindy Reynolds.  Upon information and belief, at this time Owens informed these nurses that the following patients needed to be discharged because they were not terminally ill and did not meet eligibility criteria to receive hospice care and that Medicare and SCDHEC representatives would "eat the company alive" if these patients were discovered: **Patients MR# 3008067  (CAD), MR# 3008058  (General Debility), MR# 3008017 (CAD), MR# 3009024 (General Debility), MR# 3009021 (ASCVD), MR# 3009015 (CAD), MR# 3009014 (CAD), MR# 3008004 (Dementia), MR# 3009022 (CAD)  and MR# 3008057 (General Debility)**.  Owens further stated that CAD was not a real hospice diagnosis.  All of these patients had been receiving Medicare or Medicaid hospice benefits for at least six months, and some of these patients had been receiving Medicare or Medicaid hospice benefits for over a year.  These patients suffered from chronic diseases, and were not terminally ill, and HCH had unlawfully and fraudulently filed claims for payment from Medicare or Medicaid for these patients for the hospice benefits HCH had provided to them.

**Fraudulently Failing to Follow Patients' Plans of Care**

59.     Most of the HCH Defendants' hospice patients were not terminally ill and signed up for hospice care in order to receive house care or personal care.  During the time the Relators were employed with HCH, the home health aides generally went to the patients' homes and performed light housekeeping, took the patients on personal errands, or just socialized with the patients.  The HCH home health aides rarely bathed patients, rarely dressed patients, and rarely assisted the patients with self-care.  Defendant Owens told HCH home health coordinator Mary Burgess that the home health aides had not been and were not following the patients' plans of care, yet HCH nevertheless unlawfully and fraudulently filed claims for payment from Medicare and/or Medicaid for these home health aide hospice services even though HCH knew it was not entitled to receive such payments due to the home health aides' failure to follow the patients' plans of care.

**Fraudulent Marketing Practices, Fraudulent Hospice Notice of Elections and Fraudulent Circumvention of CAPS Limits**

60.     In fact, the reason many patients signed up for hospice care with the HCH Defendants is due to their fraudulent marketing practices.  The HCH Defendants made repeated misrepresentations to patients about the benefits of the federal hospice programs and fraudulently omitted telling patients that by electing federal hospice benefits they were agreeing to waive certain Medicare benefits related to their "so-called" terminal illness, including all treatments for the purposes of curing the terminal illness, and that an election to receive Medicare hospice benefits entitled the patients to palliative end-of-life care for the relief of pain, stress and other debilitating symptoms of their illness.  The HCH Defendants deceptively emphasized the availability of hospice care for long term

care patients, such as housekeeping and aides to run personal errands, and deceptively

downplayed or ignored the terminal illness requirement when marketing to potential

patients in an intentional effort to keep the patients in the dark and uninformed of the

consequences of an election of federal program hospice benefits.

61.    In fact, many of the HCH patients' Notice of Election of Hospice Benefits

forms were forged or the patients or their representatives were tricked into signing these

forms.  For example, HCH Patients MR# 3008056, MR# 3009026, and MR# 3008017 all

complained to Relators that they had not signed an election of hospice benefits or did not

know that they had been duped into electing hospice benefits which effectively meant

that they had agreed that they had terminal illnesses when in fact they did not.  By

fraudulently obtaining or forging patients' Notice of Election of Hospice Benefits, the

HCH Defendants defrauded the federal government when they submitted claims for

payment based upon these fraudulent documents and records.

62.    Upon information and belief, the HCH Defendants engaged in a plan or

scheme to enlist individuals to elect hospice benefits and care who were not terminally ill

in an effort to increase the HCH Defendants' number of enrollees to artificially increase

their numbers for CAPS (or PIPS) purposes and to gain increased payments from

Medicare and Medicaid and/or their fiscal intermediary based upon false and fraudulent

claims.  Defendants HCH and Beacon have charged for hospice benefits when no hospice

care was truly indicated for enrollees who were not terminally ill and not eligible for

hospice benefits by improperly and fraudulently enrolling such patients for hospice

election when they were not, in fact, terminally ill or eligible for hospice benefits.  These

Defendants have sought to "slam" numbers of enrollees by inducing patients to sign an

election for hospice benefits forms who were not terminally ill or eligible for hospice

benefits to artificially and fraudulently increase their numbers of enrollees and to gain

monetary benefits to which these Defendants were not properly and legally entitled.

These actions have caused the federal government, through Medicare and Medicaid, to

pay for hospice benefits and at CAPS (or PIPS) rates that were falsely and fraudulently

inflated as submitted by these Defendants.

**Fraudulently Changing the "Terminal Illness" Diagnoses of Patients**

63.     The HCH Defendants had a false and fraudulent practice and pattern of

changing the "so-called" terminal illnesses of patients in order to try to avoid detection by

regulatory authorities and to falsely and fraudulently increase the amount of federal

government reimbursements for the patients.

64.     For instance, on or about October 13, 2008, the initial alleged terminal

illness of Patient MR# 3008058 was General Debility.  Then, on or about February 27,

2009, the alleged terminal illness of Patient MR# 3008058 became CAD.   Then, on or

about March 31, 2009, the alleged terminal illness of Patient MR# 3008058 became

General Debility.   Then, on or about May 4, 2009, the alleged terminal illness of Patient

MR# 3008058 became arteriosclerotic cardiovascular disease ("ASCVD").  Then, on or

about August 1, 2009, the alleged terminal illness of Patient MR# 3008058 became

General Debility.

65.     In another such example, on or about October 21, 2008, the initial alleged

terminal illness of Patient MR# 3008082 was General Debility.  Then, on or about

November 17, 2008, the alleged terminal illness of Patient MR# 3008082 became CHF.

Then, on or about January 28, 2009, the alleged terminal illness of Patient MR# 3008082

became CAD.   Then, on or about May 4, 2009, the alleged terminal illness of Patient MR# 3008082 became CHF.  (Patient MR# 3008082 was also sometimes identified as MR # 3008063.)  The alleged terminal illnesses of Patient MR# 3008082 were fraudulent because this patient was not terminally ill, and all of the medical records, charts, terminal illness certification and re-certifications, notice of election, and plan of care were false and fraudulent, and likewise all of the HCH Defendants' submissions and claims for payment from, and cost report certifications to, the federal government with respect to this patient were false and fraudulent.

66.    The purported terminal illnesses of Patient MR# 3008058 and Patient MR# 3008082 were false and fraudulent because these patients were not terminally ill, and all of their medical records, charts, terminal illness certification and re-certifications, notices of election, and plans of care were therefore false and fraudulent, and likewise all of the HCH Defendants' submissions and claims for payment and cost report certifications to the federal government with respect to these patients were false and fraudulent.

**Forged and Fraudulent Terminal Illness Certifications and Doctors' Orders**

67.    During one Monday morning staff meeting during 2009, HCH Medical Records Clerk Loris Tanner (Tanner) informed Fullard that Dr. Maxwell Egbonium (Egbonium) had refused to sign the HCH patients' physician orders and that Egbonium had copied the patients' charts and given them back to her.   Fullard falsely informed Tanner at that time that the orders were already signed.  In fact, Egbonium's signature on the patients' physician's orders had been forged.

68.     Dr. Ernest Atkinson (Atkinson) became the HCH Lake City Medical Director.  Dr. Atkinson told Fullard at an IDT meeting not to try to slip papers to him to sign orders which were not proper, and he wanted all of the non-terminal patients admitted with diagnosis of general debility discharged.  Dr. Atkinson eventually resigned as Medical Director on or about January 12, 2010.

69.     McKenzie was once Dr. Atkinson's nurse and she kept him informed of the frauds and improper conduct which was occurring at HCH.  HCH nurses McKenzie and Reynolds both did patient admissions and they were instructed by Defendant Fullard to admit patients who did not meet qualifications to be admitted to its hospice program.  Upon information and belief, McKenzie and Reynolds were afraid they would lose their nursing licenses.  HCH Nurse McKenzie stopped doing admissions and Nurse Reynolds went PRN (an "as needed" nurse) because they believed that Defendants Lee and Burton cared more about the money and less about the patients and breaking hospice eligibility requirements.

70.     On or about October 5, 2009, Relator Fulton contacted HCH HR Manager Blanding and informed her of Fullard's rude, disrespectful behavior toward the entire staff and reported her knowledge of Fullard's forging physicians' signatures on orders.  Relator Fulton informed Blanding that she had witnessed Fullard forging Dr. Egbonium's signature on physician orders.  Relator Fulton also informed Blanding that Fullard's administrative assistant, Janice McKnight (McKnight), routinely forged doctors' signature on physicians' orders.  On or about October 6, 2009, Blanding and Director Lee finally terminated Fullard and informed the entire staff that she no longer worked for HCH.

71.     Upon information and belief, some of the documents which contained

forged signature of Dr. Egbonium included the following:[2]

- Admission Medication List of Patient MR # 3008021 dated July 3, 2008 (Ex. 1)
- Admission DME & Supplies of Patient MR # 3008021 dated July 3, 2008 (Ex. 2)
- Physician Certification/Recertification of Patient MR # 3008029 dated July 18, 2008 (Ex. 3)
- Admission Physician Orders of Patient MR # 3008021 dated July 3, 2008 (Ex. 4)
- Admission DME & Supplies of Patient MR # 3008029 dated July 18, 2008 (Ex. 5)
- Admission Physician Orders of Patient MR # 3008029 dated July 18, 2008 (Ex. 6)
- Physician Certification/Recertification of Patient MR # 3008021 dated July 3, 2008 (Ex. 7)
- Admission Medication List of Patient MR # 3008030 dated July 18, 2008 (Ex. 8)
- Physician Certification/Recertification of Patient MR # 3008030 dated July 18, 2008 (Ex. 9)
- Physician Referral/Order Form of Patient MR # 3008021 dated October 24, 2008 (Ex. 10)
- Physician Certification/Recertification of Patient MR # 3008021 dated December 23, 2008 (Ex. 11)
- Admission Medication List of Patient MR # 3008068 dated October 24, 2008 (Ex. 12)
- Admission Physician Orders of Patient MR # 3008068 dated October 24, 2008 (Ex. 13)
- Admission DME & Supplies of Patient MR # 3008068 dated October 24, 2008 (Ex. 14)
- Medication Profile of Patient MR # 3008030 dated January 9, 2009 (Ex. 15)
- Admission Medication List of Patient MR # 3008029 dated July 18, 2008 (Ex. 16)
- Admission Physician Orders of Patient MR # 3008030 dated July 18, 2008 (Ex. 17)
- Admission DME & Supplies of Patient MR # 3008030 dated July 18, 2008 (Ex. 18)

**Unlawful Referral and Kickback and Bribery Schemes**

72.     The HCH Defendants combined and conspired to devise at least two

unlawful artifices and schemes in order to fraudulently induce numerous hospice referrals

to the HCH Defendants' hospice facilities.  The HCH Defendants intentionally devised

---

[2] Exhibits 1 through 18 are attached hereto and incorporated herein by reference.  These Exhibits have been redacted in part to protect the patients' personal identification information contained therein.

and perpetrated these schemes knowing that they were in violation of the federal AKS and Stark statutes.

73.    In the first unlawful kickback and bribery scheme, the HCH Defendants developed and implemented a policy of paying each employee a referral fee of $138 for every hospice patient an employee referred to HCH or Beacon.  For instance, upon information and belief, HCH employee Janet McKnight got paid a $138 referral fee from HCH for referring Patient MR# 3008049 to HCH as a hospice patient.  Upon information and belief, another HCH employee, Johnlyn Nettles, received three separate referral fees of $138 from HCH for referring three hospice patients to HCH, to wit, Patient MR# 3008056, Patient MR# 3008058, and Patient MR# 3008034.  These and other similar such patient referral fees paid by the HCH Defendants were kickbacks and/or bribes in knowing violation of the federal AKS, Stark and Health Care Fraud statutes, as well as Medicare and Medicaid statutes, regulations, rules and conditions of participation.

74.    In the second unlawful kickback and bribery scheme, Defendants HCH, Burton, Lee, Owens, Fullard, Roberts and Suncrest combined and conspired to implement illegal kickbacks and/or bribes to Suncrest from HCH in payment for referrals of hospice patients to HCH.  The object of the conspiracy was carried out by the overt acts of Suncrest and Roberts referring hospice patients to HCH in return for HCH, by and through Burton, Owens, Lee and Fullard, providing Suncrest a certified home health aide. The HCH Defendants promised to provide, and did provide, Suncrest and Roberts a certified home health aide who was available for 8 hours per day for Suncrest residents/patients who did not need and certainly did not qualify for the service. The said HCH Defendants also provided Suncrest and Roberts with a desk and office chairs as

kickbacks and/or bribes in partial payment for the unlawful hospice referrals made to HCH by Suncrest and Roberts.  Some of the patients who were referred to HCH by Suncrest and Roberts pursuant to this unlawful kickback and bribery scheme included, but were not limited to, Patient MR# 3009021, Patient MR# 3009022, Patient MR# 3009023, and Patient MR# 3009029.  These patients did not qualify for hospice care because they were not terminally ill nor expected to die within 6 months of their admittance as HCH hospice patients.   These and other similar such kickbacks and/or bribes paid by the HCH Defendants to Suncrest and Roberts were in knowing violation of the federal AKS, Stark and Health Care Fraud statutes, as well as Medicare and Medicaid statutes, regulations, rules and conditions of participation.

**Frauds Related to Medications**

75.    In or about 2008, Defendant Fullard informed the HCH staff that HCH was not spending enough money on medications and that HCH had to increase its medication orders.  At some point thereafter, HCH began requesting its nurses to order patients' medications from Irmo Pharmacy located in or near Columbia, South Carolina. Upon information and belief, HCH CEO Burton's wife was the pharmacist at the Irmo Pharmacy at all times pertinent to the allegation in this complaint.  The nurses complained to Fullard that every time that they submitted patients' medical record sheets to see what medications were required to be paid for by HCH, the medication approvals were never the same.  Fullard informed the nurses that the pharmacist determines which medications were supposed to be paid for by HCH.

76.    Some of HCH patients began to complain about their Medicare Part D Drug Plan being billed for medications which were supposed to be paid for by HCH.  For

example, Patient MR# 3008070 and Patient MR# 3009026 complained to Relator

Singletary that they were in their Medicare Gap because they were paying for their own

medications and that HCH was only paying the co-payment when HCH was supposed to

be paying more than just the co-payment for their medications.  Patient MR# 3008064

made similar complaints to another HCH social worker.  Relator Singletary and another

HCH social worker informed Defendant Fullard of these complaints regarding HCH's

improper payments and billings with respect to the Medicare Part D Drug Plans.  Fullard

said that she had contacted the Medicine Cabinet Pharmacy in Lake City, South Carolina

to discuss medication payments and billings regarding the Medicare/Medicaid programs.

HCH continued to instruct its employees to bill patient medications to their Medicare Part

D Drug Plans and to bill HCH for the co-payments.  After Relator Singletary advocated

on behalf of Patient MR# 3008064, this patient's medication costs were transferred from

the patient's Medicare Part D Drug Plan and to an HCH account.

77.     Upon information and belief, the HCH Defendants routinely kept false

and fraudulent medical records and patient documents and falsely submitted improper

and fraudulent claims for payment from Medicare and Medicaid for medications,

including, but not limited to, Patient MR# 3008064, Patient MR# 3008070 and Patient

MR# 3009026.

**Medically Unnecessary, Unreasonable and Excessive Services**

78.     Because all of the Defendants' hospice patients set forth above were not

terminally ill and were not expected to die within 6 months of their initial certification or

subsequent re-certifications, the hospice services which were provided to them were

medically unnecessary, unreasonable and excessive.  Again, most of the patients of

Defendants Beacon and HCH were not terminally ill and did not qualify for hospice care reimbursements by Medicare and Medicaid.  All of the claims for payment to Medicare and Medicaid for hospice services for the above mentioned patients of Defendants Beacon and HCH were false and fraudulent because these services were not medically necessary and not reasonable for the palliation of a terminal illness and were excessive. Again, Relators estimate that approximately 80% of the patients of Defendants Beacon and HCH did not qualify for hospice benefits under the Medicare and Medicaid programs but Defendants Beacon and HCH fraudulently made claims to these federal programs for hospice services nevertheless.

79.    Other examples of medically unnecessary, unreasonable and excessive services to HCH hospice patients include, but are not limited to, the following:  HCH Patient MR# 3008056 was ordered a medically unnecessary wheelchair which was not needed for the palliation of a terminal illness and was never used by the patient.  Some of HCH patients received medically unnecessary and excessive home health aide services, including but not limited to, MR# 3009037, who unnecessarily received about 8 hours of home health aide services per day, and MR# 3009025, who also unnecessarily received about 4 hours of home health aide services per day, both of which were not needed for the palliation of a terminal illness.  Patient MR# 3008057 was an HCH patient and Fullard fraudulently ordered a hospital bed for this patient which was used for the patient's husband and not for Patient MR# 3008057, and the related claim was therefore fraudulent and in knowing violation of the federal AKS, Stark and Health Care Fraud statutes, as well as Medicare and Medicaid statutes, regulations, rules and conditions of participation.

80.     All of the claims for payment to Medicare and Medicaid for hospice services for the above mentioned patients of Defendants Suncrest and Roberts were false and fraudulent because these services were not medically necessary and not reasonable for the palliation of a terminal illness and were excessive, and in violation of Medicare/Medicaid laws, regulations, rules, and conditions of participation, including, but not limited to, 42 U.S.C. § 1395y(a)(1)(C) ("no payment may be made under part A or part B of this subchapter for any expenses incurred for items or services … in the case of hospice care, which are not reasonable and necessary for the palliation or management of terminal illness), and 42 C.F.R. Part D (§ 418.50 – hospice care must be "reasonable and necessary for the palliation and management of terminal illness").  Even though these patients of Defendants Suncrest and Roberts did not qualify for hospice benefits under the Medicare and Medicaid programs, Defendants Suncrest and Roberts fraudulently made claims to these federal programs for hospice services nevertheless.

**<u>Warnings to the HCH Defendants</u>**

81.     The HCH Defendants were repeatedly warned of their fraudulent billing practices with respect to their Medicare and Medicaid patients set forth hereinabove and hereinbelow.  The HCH Defendants were repeatedly told by the Relators and other employees that they were enrolling patients for hospice services when the vast majority of patients did not meet the eligibility requirement for Medicare and Medicaid hospice benefits as set forth by federal laws, regulations, rules and conditions of participation. The HCH Defendants were also warned about the forged and fraudulent certifications and recertifications that patients were terminally ill when, in fact, they were not terminally ill.

82.     Relator Singletary and the nurses did not trust Defendant Fullard because they felt hospice services were being provided to patients that did not qualify as hospice patients under the applicable federal laws, regulations and rules regarding Medicare and Medicaid.  During Monday morning staff meetings, Singletary and the nurses would verbalize their concerns and complaints to Defendant Fullard about the inappropriate and illegal admissions of hospice patients who were not terminally ill.  Fullard informed Singletary and the nurses on how and what was needed to be documented in order to keep patients in hospice even though they did not really qualify.  Fullard told Singletary and the nurses that an individual could be admitted or remain at the hospice as long as the patient had a chronic illness like dementia, CHF, CAD, COPD or Human Immunodeficiency Virus ("HIV"), and that the patient did not have to have a diagnosis of terminal illness.  Although the Medicare and Medicaid rules required that a patient be diagnosed to die within six months in order to be enrolled to receive hospice treatment, Fullard stated that no one really knew when someone was going to die.  Fullard told the entire staff that she wanted long-term patients that could stay at the HCH hospice facility for at least 2 years or longer.  Most of the HCH patients had chronic illnesses or health problems due to old age, but were not truly terminally ill.

83.     Upon information and belief, when dialysis physician Dr. Jeffrey Smith found out that his patient, Patient MR# 3008071, had been repeatedly admitted into the HCH hospice program, he contacted Defendant Fullard and threatened to report her to government authorities for admitting and readmitting the patient in violation of federal law.  Upon information and belief, Dr. Smith called Fullard several times and informed her that this patient did not need and did not qualify for hospice care.

84.    Patient MR# 3008017 was not terminally ill but was enrolled into the hospice program by HCH nevertheless, and, as noted above, the patient claimed to have been tricked into signing up for hospice.  Relator Singletary reported and complained to HCH employees Fullard, Owens and others that the patient claimed to not qualify for hospice and had been tricked into doing so, but there was no response to Singletary's reports and complaints other than to have Singletary get fired.

85.    Patient MR# 3008061 was not terminally ill but was enrolled into the hospice program by HCH nevertheless with a diagnosis of ASHD.  HCH nurse Bazen repeatedly warned Fullard that this patient did not qualify for hospice, and after the patient received some aggressive surgery and her doctor requested physical therapy, this patient was eventually discharged.

86.    Patient MR# 3008004 was not terminally ill but was enrolled into the hospice program by HCH nevertheless with a diagnosis of dementia.  HCH nurse Bazen repeatedly warned Fullard that this patient did not qualify for hospice, but her warnings were continuously ignored.

87.    Between February and March of 2009, the HCH nurses got scared because the majority of the patients on the HCH census roll were admitted with diagnoses of general debility or other diagnoses that did not meet the criteria for a terminal illness according to hospice guidelines.  Admissions Nurse Nettles and the other nurses complained to Fullard about the general debility diagnoses and the inappropriate admissions of patients to HCH who did not properly qualify for hospice care.  Fullard held a staff meeting and, upon information and belief, the nurses were not satisfied with her answers and explanations.

88.    In or about February of 2009, HCH Nurses Bazen, Nettles, and Reynolds met with HCH CEO Burton and informed him of their concerns about admitting patients to HCH facilities with chronic illnesses and not terminal illnesses in violation of Medicare/Medicaid laws, rules and regulations. They also reported how many of the physicians' orders for patients were not getting signed or were being fraudulently signed. The nurses reported Fullard's fraudulent misconduct to CEO Burton. They informed the HCH CEO of their concerns of keeping patients that they knew did not qualify for hospice care. After their meeting, Fullard was informed of the nurses' concerns and complaints, and started retaliating against them all. Fullard told the Relators that they should not try to report Fullard for her fraudulent activities like the nurses had done because CEO Burton trusted her and would tell her about the allegations against her, and that she would retaliate against them. Nurses Nettles and Bazen left HCH by May of 2009 because Fullard had been retaliating against them when she found out about their reports.

89.    Many, if not most, HCH patients could have benefited from home health aide and community long-term care services and not hospice services. Many of the nurses at HCH attempted to inform HCH CEO Burton and Defendant Lee of their concerns with admitting and keeping patients that did not meet hospice criteria and they were all told it was just a matter of how you document the admission. Many of the Clinical Staff at HCH repeatedly expressed similar concerns with Lee, Burton, Owens and Blanding about inappropriate admissions, but the staff was told repeatedly that upper management supported HCH's clinical director's decisions and that they stood behind these decisions 158%.

90.     As set forth above, on or about October 5, 2009, Relator Fulton contacted Defendant Blanding and informed her of Fullard's rude, disrespectful behavior toward the entire staff and reported her knowledge of Fullard's forging physicians' signatures on orders. Relator Fulton informed Blanding that she had witnessed Fullard forging Dr. Egbonium's signature on physician orders. Relator Fulton also informed Blanding that Fullard's administrative assistant, Janice McKnight, routinely forged doctors' signature on physicians' orders. On or about October 6, 2009, Blanding and Lee finally terminated Fullard.

## Relators' Retaliatory Discharge

91.     On or about January 13, 2010, HCH wrongfully terminated the employment of both Relators. Relator Fulton was unlawfully terminated by HCH for purportedly creating a hostile, non-productive work environment. Relator Singletary was unlawfully terminated by HCH for purportedly interfering with the work performance of other HCH staff, participating in disruptive activity, creating a hostile, non-productive work environment, and being continuously insubordinate in acts and statements. None of these accusations against Relators Singletary and Fulton were true. In fact, the real reason that the Relators were fired was because they continued to alert HCH management that the HCH Defendants were violating federal health care laws and regulations with the fraudulent, inappropriate conduct set forth above. The Relators warned HCH management of the foregoing violations and the potential for criminal, civil and administrative fraud penalties the company and managers could face under the False Claims Act provisions. In response, HCH simply fired the Relators so that the company could continue its fraudulent conduct. The allegations against the Relators were merely a

pretext for the real reason underlying their firing, to wit, because they were blowing the whistle on inappropriate, fraudulent conduct of the HCH Defendants.

## COUNT 1

## SECTION 3729(a)(1)(A) CLAIM

92.    Relators/Plaintiffs incorporate by reference and re-allege all paragraphs of this complaint set forth above as if fully set forth herein.

93.    Defendants HCH, Beacon and Suncrest knowingly presented, or caused to be presented, and continue to present or cause to be presented, false and fraudulent claims for payment or approval to the United States – i.e., the foregoing false and fraudulent claims for payments from Medicare and Medicaid, in violation of 31 U.S.C § 3729(a)(1)(A).

94.    Said false and fraudulent claims were presented with the said Defendants' actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

95.    The United States relied on these false and fraudulent claims, was ignorant of the truth regarding these claims, and would not have paid Defendants HCH, Beacon and Suncrest had it known the truth of the falsity of the said Medicare and Medicaid claims by these Defendants.

96.    As a direct and proximate result of the false and fraudulent claims made by Defendants HCH, Beacon and Suncrest, the United States has suffered damages and therefore is entitled to recovery as provided by the FCA in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such violation of the FCA.

## COUNT 2

## SECTION 3729(a)(1)(B) CLAIM

97.     Relators/Plaintiffs incorporate by reference and re-allege all paragraphs of this complaint set forth above as if fully set forth herein.

98.     The Defendants HCH, Beacon and Suncrest knowingly made, used or caused to be made or used, and continue to make, use and cause to be made or used, false records or false statements material to the foregoing false or fraudulent claims to get these false or fraudulent claims paid and approved by the United States, in violation of 31 U.S.C § 3729(a)(1)(B).

99.     These Defendants' knowingly false records or false statements were material, and continue to be material, to the false and fraudulent claims for payments they made to the United States for Medicare and Medicaid reimbursements and benefits.

100.    The Defendants' materially false records or false statements are set forth above and include, but are not limited to, the foregoing notices of election, Medicare enrollment applications, Medicaid enrollment applications, patient charts, physicians orders, plans of care, medication lists, physician referral orders, admission DME & supplies list, medication profiles, certifications and re-certifications of patients as terminally ill, certifications and representations in annual cost and data reports, and certifications in the claims for payment (i.e., CMS Form 1450, UB-04 or UB-92).

101.    These said false records or false statements were made, used or caused to be made or used, and continue to be made, used and caused to be made and used, with these Defendants' actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

102.     As a direct and proximate result of these materially false records or false statements, and the related false or fraudulent claims made by Defendants HCH, Beacon and Suncrest, the United States has suffered damages and therefore is entitled to recovery as provided by the FCA in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such violation of the FCA.

## COUNT 3

## SECTION 3729(a)(1)(G) CLAIM

103.     Relators/Plaintiffs incorporate by reference and re-allege all paragraphs of this complaint set out above as if fully set forth herein.

104.     Defendants HCH, Beacon and Suncrest knowingly made, used or caused to be made or used false records or false statements, and continues to knowingly make, use or caused to be made false records or false statements, material to an obligation to pay or transmit money or property to the United States Government, or knowingly concealed and continues to conceal an obligation to pay or transmit money or property to the United States Government, or knowingly and improperly avoided or decreased, and continues to knowingly and improperly avoid and decrease, an obligation to pay or transmit money or property to the United States Government, in violation of 31 U.S.C § 3729(a)(1)(G).

105.     These said false records or statements were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

106.     As a direct and proximate result of these knowingly false records or false statements by the Defendants HCH, Beacon and Suncrest, the United States has suffered

damages and therefore is entitled to recovery as provided by the FCA of an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT 4

## SECTION 3729(a)(1)(C) CLAIM

107.    Plaintiffs incorporate by reference and re-allege all paragraphs of this complaint set out above as if fully set forth herein.

108.    In violation of 31 U.S.C § 3729(a)(1)(C), all of the Defendants knowingly combined and conspired to violate sections of the FCA, including, but not limited to, 31 U.S.C § 3729(a)(1)(A), 31 U.S.C § 3729(a)(1)(B) and 31 U.S.C § 3729(a)(1)(G) as set forth above.

109.    In a conspiracy and combination, the Defendants knowingly presented, or caused to be presented, and continue to present or cause to be presented, false and fraudulent claims for payment or approval to the United States – i.e., the foregoing false and fraudulent claims for payments from Medicare and Medicaid, in violation of 31 U.S.C § 3729(a)(1)(A).

110.    In a conspiracy and combination, the Defendants knowingly made, used or caused to be made or used, and continue to make, use and cause to be made or used, false records or false statements material to the foregoing false or fraudulent claims to get these false or fraudulent claims paid and approved by the United States, in violation of 31 U.S.C § 3729(a)(1)(B).

111.    In a conspiracy and combination, the Defendants knowingly made, used or caused to be made or used false records or false statements, and continues to knowingly make, use or caused to be made false records or false statements, material to an

obligation to pay or transmit money or property to the United States Government, or knowingly concealed and continues to conceal an obligation to pay or transmit money or property to the United States Government, or knowingly and improperly avoided or decreased, and continues to knowingly and improperly avoid and decrease, an obligation to pay or transmit money or property to the United States Government, in violation of 31 U.S.C § 3729(a)(1)(G).

112.    During the conspiracy and combination, the conspirators acted knowingly to have the foregoing false and fraudulent claims, statements, and records to be made, used and/or presented, or acted with reckless disregard or deliberate ignorance of whether or not the claims, statements and/or records were false and fraudulent.

113.    As a direct and proximate result of the conspiracy to make false or fraudulent claims by all of the Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the FCA in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT 5

## SECTION 3730(h) CLAIM

114.    Plaintiffs/Relators incorporate by reference and re-allege all paragraphs of this complaint set forth above as if fully set forth herein.

115.    From the fall of 2008 through on or about January 13, 2010, Relators were employees of Defendant HCH.

116.    During the course of their employment with Defendant HCH, Relators obtained personal knowledge of the foregoing fraudulent conduct of the Defendants.

117.    Relators reported the foregoing fraudulent conduct to Defendant HCH as well as individual Defendants Burton, Lee, Fullard, Blanding, Owens, and expressed concern that the said fraudulent conduct would subject the Defendants to potential civil and criminal penalties for Medicare and Medicaid fraud pursuant to the FCA and a whistleblower lawsuit by Relators if the frauds were not corrected and self-reported.

118.    As a direct and proximate result of Relators' lawful acts to stop one or more of the Defendants' foregoing FCA violations, including but not limited to the investigation of, and complaints to the Defendants of, the foregoing fraudulent conduct, the HCH Defendants wrongfully harassed, threatened, and discriminated against the Relators with respect to the terms and conditions of their employment.

119.    As a direct and proximate result of Relators' aforesaid lawful acts to stop one or more of the Defendants' foregoing FCA violations, including but not limited to the investigation of, and complaints to the Defendants of, the foregoing fraudulent conduct, on or about January 13, 2010, Defendant HCH wrongfully terminated the Relators' employment in retaliation for Relators' reports of, and complaints about, the foregoing fraudulent conduct, said retaliatory discharges from employment being in violation of 31 U.S.C § 3730(h).

120.    As a direct and proximate result of the Defendant HCH's wrongful termination of Relators' employment in retaliation of their aforesaid whistleblowing activities with respect to the foregoing fraudulent conduct of the Defendants, Relators have been injured, and are entitled to all relief necessary to make them whole, including, but not limited to, reinstatement with the same seniority status they would have had but for the retaliatory discharge, 2 times the amount of back pay, interest on the back pay,

and compensation for special damages sustained as a result of the retaliatory discharge, including litigation costs and reasonable attorneys' fees.

## COUNT 6

### Wrongful Discharge In Violation of Public Policy

121.    Plaintiffs/Relators incorporate by reference and re-allege all paragraphs of this complaint set forth above as if fully set forth herein.

122.    That the unjust wrongful discharge and termination of Plaintiffs' employment with Defendant HCH was the response of the Defendant HCH, its employees, agents and servants, to Plaintiffs' refusal to allow improper and illegal practices of the company due to the Defendants' fraudulent actions as set forth above.

123.    That the aforesaid conduct of Defendant HCH, its employees, agents and servants, violates South Carolina laws and United States laws against retaliatory dismissal and was, in fact, retaliatory in nature.

124.    That the aforesaid discharge of Plaintiffs' employment by Defendant HCH, and its employees, agents and servants, constitutes a violation of a clear mandate of public policy of the State of South Carolina to protect employees from wrongful discharge when said employees report, complain about, and/or otherwise oppose fraudulent, illegal activities by the employer.

125.    That as a direct and proximate result of the aforesaid conduct of the Defendant HCH, and its employees, agents and servants, Plaintiffs have been damaged as aforesaid, and are entitled to recover both actual and punitive damages, in such amount as a jury may award.

## COUNT 7

**Breach Of Contract**

126.    Plaintiffs/Relators incorporate by reference and re-allege all paragraphs of this complaint set forth above as if fully set forth herein.

127.    Defendant HCH and each Plaintiff entered into a contract whereby HCH agreed to employ the Plaintiffs within the State of South Carolina.

128.    That because of Plaintiffs' questions, complaints and reports of violations of the law in filing fraudulent Medicare and Medicaid claims as set forth above, Defendant HCH wrongfully terminated Plaintiffs' employment, thereby breaching the contract of employment between Plaintiffs and Defendant HCH.

129.    That as a direct and proximate result of Defendant HCH's wrongful breach and termination of Plaintiffs' contracts of employment, Plaintiffs have been damaged, including but not limited to, Plaintiffs have suffered a loss of income and benefits, have been deprived of contractual rights conferred by the aforesaid contracts, their ability to work in the field has been damaged, and they have been otherwise injured and damaged and are entitled to a recovery of actual damages in such amount as a jury may determine.

**COUNT 8**

**Tort Of Outrage**

130.    Plaintiffs/Relators incorporate by reference and re-allege all paragraphs of this complaint set forth above as if fully set forth herein.

131.    Defendant HCH was wanton, willful and intentional in the discrimination of the Plaintiffs in discharging them in retaliation due to their complaints and reports of

company violations for filing fraudulent claims to Medicare and Medicaid as set forth in detail above.

132.    Such action by Defendant HCH were so extreme and outrageous as to exceed all possible bounds of decency, thereby intentionally causing Plaintiffs to suffer severe emotional distress that no reasonable man or woman could be expected to endure.

133.    Such actions by Defendant HCH, its employees, agents and servants, were so extreme and outrageous as to cause the Plaintiffs extreme shock, fright and emotional upset and distress in violation of the Tort of Outrage.

134.    That by reason of the aforesaid recklessness, willfulness and wantonness of Defendant HCH, its employees, servants and agents, Plaintiffs have suffered severe and permanent injuries, both physically and mentally.

135.    As a direct and proximate consequence of the aforesaid injuries sustained as a result of the aforesaid outrageous conduct of Defendant HCH, its employees, servants and agents, the Plaintiffs have incurred expenses and incidental costs and have had to endure pain and suffering resulting in the loss of enjoyment of life, and such pain and suffering will continue to impair the Plaintiffs, and Plaintiffs are entitled to recover such actual and punitive damages as to be determined by a jury.

## COUNT 9

### Aiding and Abetting

136.    Plaintiffs/Relators incorporate by reference and re-allege all paragraphs of this complaint set forth above as if fully set forth herein.

137.    Defendants Burton, Lee, Owens and Blanding aided and abetted Defendant HCH in the commission of the wrongful acts of wrongful discharge, breach of

contract, and infliction of the tort of outrage against the Plaintiffs which caused the Plaintiffs injuries and damages as set forth above.

138.    Defendants Burton, Lee, Owens and Blanding knew that Defendant HCH was wrongfully breaching tort and contractual duties owed to the Plaintiffs.

139.    Defendants Burton, Lee, Owens and Blanding substantially assisted, encouraged and aided and abetted Defendant HCH in the wrongful conduct set forth above, and was a proximate cause of injuries and damages to the Plaintiffs, and the Plaintiffs are entitled to recover such actual and punitive damages as to be determined by a jury.

## PRAYER FOR RELIEF

140.    WHEREFORE, Plaintiffs/Relators respectfully request this Court to enter judgment against Defendants, jointly and severally, and demand relief as follows:

(a)    That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the False Claims Act, 31 U.S.C. § 3729 *et seq.* provides;

(b)    That civil penalties be imposed for each and every false claim that Defendants presented to the United States and/or its agencies;

(c)    That pre-judgment and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relators necessarily incurred in bringing and pressing this case;

(d)    That the Court grant permanent injunctive relief to prevent any recurrence of the violations of the False Claims Act for which redress is sought in this Complaint;

(e)    That the Relators be awarded the maximum amount allowed to them pursuant to the False Claims Act; and

(f)    For Counts 5 through 9, that the Relators/Plaintiffs be granted all relief necessary to make them whole, including but not limited to:

i.    Judgment in favor of the Plaintiffs and against Defendants for all causes of actions in an amount which is fair, just and reasonable,

and for actual, compensatory, consequential, special, and punitive damages;

ii.    Prejudgment interest, costs and attorneys' fees as may be allowed by law;

iii.    Judgment in favor of the Plaintiffs and against Defendants with two times back pay and associated benefits they would have earned, interest on back pay, reinstatement with appropriate seniority status, and all lost or diminished benefits to be determined by the trier of fact;

iv.    Judgment in favor of the Plaintiffs and against Defendants for front pay and any other work benefits they lost in an amount to be determined by the trier of fact;

v.    Judgment in favor of the Plaintiffs and against Defendants in such an amount for punitive damages, pain and suffering, embarrassment, humiliation, shock and emotional distress in an amount to be determined by the trier of fact; and

vi.    Judgment against Defendants, in such an amount of actual damages, punitive damages, attorneys' fees, costs of this action and any other relief this Honorable Court deems allowable under law.

(g)    That this Court award such other and further relief as it deems just, fair and proper under the circumstances.

Respectfully submitted,

Joe Griffith Law Firm, LLC

/s/ *Joseph P. Griffith, Jr.*

_____

Joseph P. Griffith, Jr., Esquire (Fed.I.D. #2473)
Seven State Street
Charleston, South Carolina 29401
(843) 225-5563 (tel)
(843) 722-6254 (fax)
joegriffithjr@hotmail.com
www.joegriffith.com

Attorney for the Plaintiffs/Relators

Charleston, South Carolina
May 28, 2010

complaint.5-28-2010.jg final